UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARCOS SENA,
Petitioner,

V.

LUIS SPENCER **05** CV **10381** DPW
Respondent.

MEMORANDUM OF LAW IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS
PURSUANT TO 28 U.S.C. §2254

## A.    STATEMENT OF THE CASE

On or about May 19, 1992 a grand jury sitting in
Middlesex County returned two indictments against Marcos Sena
charging murder (92-813-001) and possession of a firearm (92-
813-002).  On July 15, 1996 trial commenced.  On July 19,
1996 a jury returned a verdict of guilty on both counts and
on July 26, 1996 the defendant was sentenced to prison for
the remainder of his natural life.  On May 19, 1999 the
Massachusetts Supreme Judicial Court reversed the conviction.
See *Commonwealth v. Sena*, 429 Mass. 590 (1999).  On January
3, 2000 the re-trial commenced.  On January 12, 2000 the
defendant was again convicted of both counts and sentenced to
remain in state prison for the remainder of his natural life.
A timely notice of appeal was filed.

On or about February 26, 2002, pursuant to M.G.L. ch. 278 §33E a motion for a new trial was filed in the Supreme Judicial Court. On or about March 4, 2002 that motion was remanded to the trial court. On August 29, 2002 an amended motion for a new trial was filed in the trial court. On January 10, 2003, by Memorandum of Decision and Order that motion was denied. A timely notice of appeal was filed.

In *Commonwealth v. Sena*, 411 Mass. 822 (2004) the Supreme Judicial Court affirmed the denial of the new trial motion and the conviction.

## B. STATEMENT OF FACTS

In *Commonwealth v. Sena*, 411 Mass. 822 (2004) the Supreme Judicial Court found the following facts:

We summarize the evidence in the light most favorable to the Commonwealth, reserving certain details for discussion in conjunction with the issues raised.

In the fall of 1991, the defendant was dating Maria Diaz, the mother of the seventeen year old victim, Carlos Cruz. Diaz terminated the relationship in January, 1992, when her son informed her that the defendant was seeing other women. At that time, the defendant threatened to kill Cruz.

On the night of March 21, 1992, Diaz, her new boy friend, Angel Baretto, and her son Cruz, were attending a friend's baby shower at 94 Lewis Street in Lowell. Diaz and Baretto left the party briefly and then returned. As they approached the house, they observed the defendant and Maureen Otero driving down Lewis Street. Diaz flagged down the defendant and began to argue with him. Baretto joined in, and a fistfight ensued, with Baretto the apparent victor.

The fight was observed by various persons attending
the baby shower. When the fight ended, the defendant
and Otero drove to the defendant's apartment on
nearby Middlesex Street. The defendant was "mad," and
told Otero that "he was gonna get them back." The
defendant went into his apartment briefly, leaving
Otero in the car. When he returned, they drove back
toward Lewis Street and parked on another street
nearby.  Otero described the defendant as still
"mad." The defendant left Otero behind in the parked
car, and proceeded to 94 Lewis Street.

Max Maldonado, the father of the baby for whom the
party was being held, observed the defendant looking
into the front window of the house at 94 Lewis
Street. Maldonado saw the defendant motion for Cruz
to come outside.  According to Maldonado, Cruz came
outside and stood on the front steps with the
defendant. Maldonado then saw the defendant "raise[]
his hand and the shot went off." The defendant's hand
"was pointed at the kid's face." Cruz fell to the
ground, and the defendant ran off.

Angel Luis Nieves, then eleven years old, was also
in attendance at the baby shower. Nieves testified
that it was he who summonsed Cruz to go to the front
door when the defendant signaled for Cruz. Nieves
then followed Cruz to the front door and stood in the
doorway with Maldonado. According to Nieves, the
defendant "pulled out his hand and shot Carlos Cruz."
Nieves then saw the defendant "scatter[]" toward the
back alley near 94 Lewis Street.

**Otero was waiting for the defendant where he had**
**left her. The defendant got in the car and "took**
**off." The defendant told Otero that he had "hit**
**somebody and the gun went off." As the defendant**
**made this statement to Otero, he gestured with his**
**right arm, extending the arm in front of him and**
**moving it across from right to left. The import of**
**this statement and gesture, and the theory of the**
**defense, was that the gun had gone off by accident**
**when the defendant had used the gun to strike Cruz.**
The defendant told Otero that he was leaving for New
York (where he was later found).

Cruz died of a single gunshot wound to the head. Dr. John Krolikowski, the medical examiner who performed the autopsy on Cruz, testified concerning the wound, which was immediately to the left of the victim's nose. Based on his observations, Dr. Krolikowski opined that the "weapon [was] fired very close to that surface, the facial surface." Dr. Krolikowski did not observe any evidence of scratches, abrasions or contusions that would reflect the gun's striking Cruz on the side of the face. On cross examination, he testified that the wound was "consistent with a near contact wound," but not a "total contact wound." He also acknowledged that there was an abrasion on the victim's face, which he attributed to "blunt trauma."

State police Sergeant John Busa had retrieved a .38 caliber semiautomatic weapon from underneath a parked car in front of 94 Lewis Street. Testing confirmed that it was the gun used in the shooting of Cruz. Sergeant Busa pointed out the sharp front edges on the barrel end of the gun's slide, opining that if the gun had been used to strike someone, the victim would have been cut by those sharp edges. Sergeant Busa also testified concerning his observations of the wound on Cruz's face. In his opinion, the stippling on one side of the wound indicated that the gun had been "almost pressed to the skin at the time of the discharge." *Id.* at 823-825.

## C.   ISSUES PRESENTED

1.    Marcos Sena was denied his right to effective assistance of counsel where his trial attorney failed to engage an expert witness to support his theory of the defense notwithstanding the fact that this same lawyer recognized the need for an expert when one year earlier he appealed the defendant's initial conviction for these charges.

4

2.     Marcos Sena was denied his 6th Amendment right to confrontation when the prior testimony of a key government witness was used during the second trial notwithstanding the government's lax approach to securing the attendance of this witness. The error was compounded where, at trial, the government produced an eyewitness who did not testify at the first trial and whose testimony triggered an absolute need to cross-examine the "unavailable" witness on issues not know during the first trial.

## D.     ARGUMENT

1.     Marcos Sena was denied his right to effective assistance of counsel where his trial attorney failed to engage an expert witness to support his theory of the defense notwithstanding the fact that this same lawyer recognized the need for an expert when one year earlier he appealed the defendant's initial conviction for these charges

This case was defended on the theory that Marcos Sena struck the victim in the face with a handgun and that the gun accidentally discharged [Tr. VII:18][1]. The defense was established through the cross-examination of witnesses Maureen Otero [Tr. V:80] and John Busa [Tr. VI:45].

---

[1]     The following abbreviations will be used throughout this brief:

Tr.        Trial Transcript
App.       Appendix to appellate brief in *Commonwealth v. Sena*, attached as Exhibit 1 to petitioner's memorandum of law in support of petition for writ of habeas corpus.

5

Notwithstanding Sena's representations to trial counsel prior to trial and the availability of trial testimony from the first trial of this case, it was during the course of trial that trial counsel recognized the viability of this defense [Schubert Affidavit, App. 55-56]. As a consequence, trial counsel never obtained the services of an expert witness to support his theory [Schubert Affidavit, App. 55-56].

## THE STANDARD

The right to counsel guaranteed by the Sixth Amendment to the United States Constitution is applicable to the states by virtue of the Fourteenth Amendment. *Burgett v. Texas*, 389 U.S. 109 (1967). Courts have interpreted this right to entitle criminal defendants to receive assistance of counsel which is reasonably competent in light of both prevailing professional norms and circumstances of the particular case. *United States v. Frappier*, 615 F. Supp 51 (1985).

The acts and omissions of defense counsel deprived the defendant of the effective assistance of counsel. To establish such a claim, the defendant must show, (1) that his attorney exhibited "serious incompetency, inefficiency, or inattention of counsel - behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer -- (2) . . . that has likely

6

deprived the defendant of an otherwise available, substantial ground of defense." *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). If ineffective assistance is present under the Massachusetts standard, as has been shown in this case, it is necessarily also present under the Federal standard. See *Commonwealth v. Nardone*, 406 Mass. 123, fn. 3 (1989); *Commonwealth v. Fuller*, 394 Mass. 251, 256 fn. 3, (1985); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

**Ineffective assistance - - first prong:**

The first prong of the *Saferian* test is satisfied by the shortcomings of counsel. "Failure to investigate the only defense a defendant has, if facts known to or with minimal diligence accessible to counsel support that defense, falls beneath the level of competency expected." *Commonwealth v. Haggerty*, 400 Mass. 437, 442 (1987). See also *Commonwealth v. Cepulonis*, 9 Mass.App.Ct. 302, 305 (1980) [A failure to investigate and pursue a plausible alibi defense known to, or with normal diligence accessible to, counsel would fall beneath the level of competency expected]. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in

7

all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington*, 466 U.S. 668, 691. Here, the decision not to investigate was unreasonable. That the gun accidentally discharged was the only defense available to Sena. Trial counsel concedes that this was his sole defense [Schubert Affidavit, App. 55-56]. "Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland v. Washington*, 466 U.S. at 491. In this case, the need for investigation and use of an expert was apparent from an existing record. Maureen Otero, John Busa and John Krolikowski had testified in the first trial. Trial counsel had read their testimony and

knew that the critical issue in this case was whether or not the gun had made contact with the victim's face. If it did, the defendant's statement to Maureen Otero was the truth. If it did not, then the Commonwealth's theory of an execution type murder would prevail. "The failure to investigate and develop evidence which could have raised a reasonable doubt in the minds of the jurors constitutes ineffective assistance of counsel where that failure effectively leaves the defendant denuded of a defense." Commonwealth v. Mitchell, ___ Mass.Sup.Ct. ___, 29 (2000). See also Commonwealth v. Farley, 432 Mass. 153, 156-157 (2000) (finding ineffective assistance of counsel where counsel failed to interview a man implicated by the defendant or investigate semen and blood evidence which supported the defendant's assertion that the man was present at the scene and was the true killer).

Regardless of the Supreme Judicial Court's position, there is no excuse for trial counsel not engaging an expert witness in this case. The Supreme Judicial Court stated:

At the outset, we note an anomaly in the claim. On appeal following the first trial, the defendant's then appellate counsel made the same argument, i.e., that trial counsel at the first trial had been ineffective in that he had failed to consult any forensic expert who could help analyze this evidence to support the defendant's theory of an accidental firing. Having obtained a reversal and remand for a new trial, the attorney who represented

9

the defendant on that successful appeal proceeded to
represent him at the second trial. In other words,
the same attorney who had contended that failure
to present expert testimony, or "even consult a
forensic pathologist," was ineffective assistance of
counsel mandating a new trial, chose not to retain an
expert or present testimony from a forensic expert at
the second trial. Against this backdrop, it would be
difficult to characterize counsel's decision with
respect to the forensic evidence as anything other
than deliberate and tactical. *Commonwealth v. Sena*,
411 Mass. 822 at 828-829.

This holding cannot be reconciled with trial counsel's
affidavit nor is it logical to make this assumption. At
least as early as 1998 trial counsel (who was then
appealing Sena's first conviction) noted a deprivation of
the right to effective assistance of counsel by failing to
consult an expert to analyze the evidence. Inexplicably,
as evidenced in the record and by his own admission, trial
counsel makes the same blunder. It is inexcusable.

The question of whether this was an accident "caused
by the defendant required counsel to investigate that
defense by seeking the opinion of an expert." *Commonwealth
v. Haggerty*, 400 Mass. at 442. "Disbelief of testimony is
not the equivalent of proof of facts contrary to that
testimony." *Boice-Perrine Co. v. Kelley*, 243 Mass. 327,
330 (1923). "Disbelief of testimony 'would not furnish the
basis for a finding the other way.'" *Commonwealth v.
Haggerty*, 400 Mass. at 442 quoting *Stuart v. D.N. Kelley &*

*Son*, 331 Mass. 76, 78 (1954). The conclusion of the judge

denying the new trial motion and the Supreme Judicial Court

departs from the reasoning applied by this Court in

*Haggerty*. The motion judge found that trial counsel

"handled the wound and firearm evidence effectively in his

cross-examination and closing argument" and that "[h]is

presentation shows skill and reasonable tactical judgments"

[R.App. 83-84]. Additionally, the Supreme Judicial Court

effectively ignores the fact that trial counsel never

argued his theory of defense during his summation.

Similarly, the Memorandum of Decision and Order and the

decision in *Sena* is either silent or evasive on the

uncontradicted affidavit of trial counsel highlighting his

omissions. Of particular concern are paragraphs 4-7 of the

affidavit which state:

> 4. Based on my conversations with Marcos Sena and my
> review of the first trial transcript and related
> materials, I defended this case on my understanding
> and belief that Marcos Sena intended to threaten Angel
> Barretto with what he believed was an unloaded gun.
> He did so to exact revenge for suffering a physical
> and emotional beating at Barretto's hands earlier that
> evening. I understood from Sena that when he returned
> to Lewis Street Barretto had already left. Sena then
> turned to Carlos Cruz, his former girlfriend's son as
> a satisfactory alternative to humiliate.
>
> 5. Marcos Sena further told me that he struck Cruz
> with the gun and that the same accidentally discharged
> upon contact. He was shocked and in disbelief that
> the gun discharged. He believed that since there was
> no clip in the gun that the weapon was not loaded.

> 6.    I have absolutely no idea why I did not make an
> opening statement in this case, nor can I explain why
> I never argued this theory of defense to the jury
> during my summation.
>
> 7.    I also cannot explain why I never engaged the
> services of a forensic pathologist and/or a firearms
> expert to support my defense in this case [R.App. 55-
> 56].

As stated in *Haggerty*, trial counsel failed to perform to

the standards the law requires in cases involving defenses

similar to the one presented here.    The judge ruling on

the new trial motion fails to account for trial counsel's

candid admissions of error.    This requires reversal.

### Ineffective assistance - - second prong:

The neglect of trial counsel "has likely deprived the

defendant of an otherwise available, substantial ground of

defence."    *Commonwealth v. Saferian*, 366 Mass. 89, 96

(1974).    Carl Majeskey's affidavit casts substantial doubt

on the defendant's guilt.    He reviewed exhibits, reports

and trial testimony and concluded that "the entry wound on

the face of Carlos Cruz is a partial contact type and the

adjacent linear abrasion to the bottom left of the entry is

consistent with being from the frontal region of the

pistol."    [Majeskey Affidavit, App. 51-54].    He further

assailed Dr. Krolikowski's testimony stating:

9.    As to Dr. Krolikowski's trial testimony, I make the
      following observations:

12

a.   [Tr. 3-16, L-13] The entry wound was oval (1/8 x
     1/8 inch). The photocopy is pretty much actual
     size and the entry wound appears to me as being
     approximately 3/8 x 3/8 inch. This is a big
     difference.

b.   [Tr. 3-20, L-21] The "wound is ovoid, round."
     This makes no sense. Ovoid is egg shaped. Round
     is round. The wound does not appear to have the
     characteristics of both.

c.   [Tr. 3-20, L-15&16] Dr. Krolikowski states there
     is "some stippling about the wound." But he
     fails to locate it precisely. My photo copy
     shows stippling along the periphery of the
     entrance wound with some isolated ones above and
     to the right extending up into the lower edge of
     the eyebrow."

d.   [Tr. 3-25, L 6&7] Here Dr. Krolikowski describes
     the entrance wound as being "a near contact
     wound".

e.   [Tr. 3-28, L 19-21] The doctor is asked if his
     saw any evidence in this examination of Carlos
     Cruz's face to indicate "that" weapon made
     contact with Carlos Cruz's face. His response is
     on [Tr. 3-29 L-1] and he answered "No". This is
     inconsistent with the linear abrasion on the
     lower left of the entry wound that extends the
     width of the entry hole.

f.   [Tr. 3-26, L 9-10] Dr. Krolikowski states stipple
     material (powder residue) would probable go
     inside the hole, but he does not say he found any
     evidence of this nature or that he looked for it.
     It does not appear that any specimens of the
     tract were taken for further study. There does
     not appear to be any photos taken of the tract.

g.   [Tr. 3-36, L-1] Here the doctor states it was not
     a total contact wound. This is correct.

h.   [Tr. 3-38, L-1] Here the doctor states the
distance involved is "within inches." This
differs dramatically from a non-total contact
wound as he testified earlier.

None of this was ever brought to the attention of the jury.
For many reasons, this omission "was likely to have
influenced the jury's conclusion." Commonwealth v. Wright,
411 Mass. 678, 682 (1992).

The only direct evidence that the jury heard came from
Max Maldonado and Tito Nieves. The credibility of both is
suspect. Maldonado admitted to ingesting a substantial
quantity of heroin that day. Nieves did not come forward
for eight years and his statement that as an eleven year
old he tried to kick the gun out of Sena's hand. He also
stated that the defendant struck the victim with the gun at
which time the weapons discharged. Additionally, Tito
testified that he told the victim that Sena wanted to speak
with him. He also never saw Fernando Santana at the door.
Santana contradicted this by testifying that he was the
person who told the victim that Sena wanted to speak with
him.

The more credible evidence suggests that this shooting
was an accident. Immediately after the shooting, Sena told
Maureen Otero that he struck the victim and the gun
accidentally discharged. John Busa's testimony intimates

14

this to be true as well. Perhaps most telling is the fact
that there was no magazine in the gun. What trial counsel
failed to represent to the jury most resembles the truth.
Marcos Sena had just been verbally and physically
humiliated by his girlfriend's new boyfriend, Angel
Barretto. Seeking to exact revenge, Mr. Sena went to his
apartment to get his gun. The absence of a clip suggested
to Sena that the gun was empty of its ammunition. When he
went back to Lewis Street, Barretto was not there.
Consequently, Marcos Sena found an adequate substitute on
whom to retaliate, his former girlfriend's son, Carlos
Cruz. Sena struck Cruz with a gun not knowing the same to
have a live round of ammunition in the chamber. Nor did he
know that the gun would accidentally discharge upon impact.
Had trial counsel brought this evidence to the attention of
the jury in a credible, well developed manner, Marcos Sena
wound not have been convicted of this crime. The motion
judge's conclusion that "[t]he evidence of the shape and
location of the stippling was plainly presented to the
jury" [R.App. 84] ignores several of Mr. Majeskey's
critical points. First there is a linear abrasion on the
lower left of the entry wound. Second, the distance
distinction of "within inches" to "partial contact"
establishes the difference between deliberately

premeditated murder and accident. Trial counsel's failure
to present this testimony precludes a rational decision on
this point. This is not a first degree murder.

2. Marcos Sena was denied his 6th Amendment right to
   confrontation when the prior testimony of a key
   government witness was used during the second trial
   notwithstanding the government's lax approach to
   securing the attendance of this witness. The error
   was compounded where, at trial, the government
   produced an eyewitness who did not testify at the
   first trial and whose testimony triggered an absolute
   need to cross-examine the "unavailable" witness on
   issues not know during the first trial

   Two days prior to the commencement of trial, the
prosecutor alerted the trial judge of his intention to use
the testimony of a witness (Fernando Santana) he could not
locate [Tr. I:7]. He offered that Lowell Police Detective
Guilfoyle attempted to locate Santana by "...contacting
employers, registry of motor vehicle checks, registration
for cars, phone checks, mail forwarding addresses, people
that knew him..." [Tr. I:7-8, App. 179-180][2]. He continued:
"We received information from a former girlfriend and son
of the former girlfriend that Santana has gone to some
parts of Puerto Rico, on a location unknown down there.

---

[2]    Detective Guilfoyle generated a follow up report
detailing his efforts to find Santana. In mid-November of
1999, Luz Morales was interviewed in preparation for trial.
On December 12, 1999, Morales told Guilfoyle that Santana
was in Puerto Rico. Efforts at finding Santant in Puerto
Rico did not commence until after trial had started [Tr.
V:180-182].

16

There was some rumor that he was coming back this weekend. We checked, again, addresses as recently as yesterday with no luck, Judge" [Tr. I:8]. The issue of unavailability was revisited on the third day of trial [Tr. V:178-194]. The Commonwealth proffered that on Saturday, January 8, 2000 and January 9, 2000, (between the second and third days of trial) the prosecutor and a detective went to Santana's last known address, could not locate the witness but found an undisturbed electric bill [Tr. V:178-180]. A roomate (Mr. Cantres) told the Commonwealth that Santana was in Vega Alta, Puerto Rico [Tr. V:180-182, 185]. The prosecutor stated that he had not had contact with this witness since the first trial in July of 1996 and that he (Santana) was flown from Puerto Rico to testify at that proceeding [Tr. V:184-186]. Later that day, the prosecutor told the trial judge: "...they brought in a Spanish-speaking officer up in Lowell, who made contact with the department in the city. They came up with an address in a neighborhood. They're sending Puerto Rican police now from that city to that location to see if he's at that location. If they find him, I told him to put him of a plane tonight and bring him back, if he'll of course, voluntarily come" [Tr. V:194]. On the fourth day of trial, the prosecutor stated:

17

"As mentioned yesterday, Sunday, we determined the
city in Puerto Rico where the present roommate stated
he had gone home to just prior to Christmas. Puerto
Rican authorities were contacted yesterday morning by
members - - by Spanish-speaking members of the Lowell
Police Department. They gave name, date of birth,
and Social Security number. The Puerto Rican
authorities relayed to the Lowell Police yesterday a
number of - - it's a common name down in the city and
a number of individuals with that name, they have
addresses, I believe, they used the word plural, that
they would be checking.

They were called again this morning. Detective
Guilfoyle received a response from Lowell Police a
little after nine this morning stating that they had
not located Mr. Santana. They are still checking
addresses. This is the status as it stands right
now, Judge, in front of the Court. [Tr. VI:67-68].

### The witness should not have been declared "unavailable" given the Commonwealth's failure to demonstrate a good faith effort to obtain Fernando Santana's presence for trial

The Sixth Amendment to the United States Constitution,

art. 12 of the Massachusetts Declaration of Rights and

M.G.L. ch. 263 §5 provide criminal defendants the right to

confront their accusers face to face. *Commonwealth v.*

*Childs*, 413 Mass. 252, 260 (1992). The confrontation

clauses of the Massachusetts constitution and M.G.L. ch.

263 §5 provide the same protection as the Sixth Amendment.

*Commonwealth v. Siegfriedt*, 402 Mass. 424, 430 (1988).

Concededly, prior recorded testimony of a witness may be

admitted at trial where:

the party against whom it is offered had an adequate
opportunity to cross-examine the witness on the prior

occasion. *Commonwealth v. Childs*, 413 Mass. 252, 260; *Commonwealth v. Bohannon*, 385 Mass. 733, 741(1982).

Unavailability has been conditioned as follows:

"[A] witness is not 'unavailable' for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a good faith effort to obtain his presence at trial.... [emphasis added]." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), quoting *Barber v. Page*, 390 U.S. 719, 724-725, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968). See also *Commonwealth v. Siegfriedt*, *supra* 402 Mass. at 427.

A diligent search is required. *Commonwealth v. Bohannon*, 385 Mass. 733, 745 (1982). "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Ohio v. Roberts*, supra 448 U.S. at 74, 100 S.Ct. at 2543, quoting *California v. Green*, 399 U.S. 149, 189 n. 22, 90 S.Ct. 1930, 1951 n. 22, 26 L.Ed.2d 489 (1970) (Harlan, J., concurring). The burden of proving unavailability, rests on the party offering the recorded testimony. *Commonwealth v. Childs*, 413 Mass. 252 at 261.

In *Childs*, the government's demonstration of diligence in its search for a witness was far more discernible than in this case. There, after two failed attempts to serve a summons, the police learned that the witness had moved three to four years earlier. *Commonwealth v. Childs*, 413 Mass. at 258. Attempts to locate the witness at three addresses received from police were unsuccessful. *Id*.

19

Information relative to out of state incarceration and motor vehicle checks were fruitless as well. *Id.* at 258-259.

In contrast, the prosecution in Sena's case learned that Santana "was coming back this weekend" [Tr. I:8]. On the third day of trial, the government represented the disclosure of a roommate who knew the witness to be in Vega Alta, Puerto Rico [Tr. V:180-182]. The next day, edging ever closer, the assistant district attorney said that the police in Puerto Rico were checking names and addresses and would make contact if Santana was located [Tr. VI:67-68]. That notwithstanding, the trial judge allowed the prior testimony to be admitted. In *Childs*, the record casts doubt on whether or not the witness, DeMattia, would ever be located. The evidence in this case suggests otherwise. Each time the prosecution made inquiry it seemed to get closer to locating the witness. It accelerated its efforts to find Santana only after the impanelment and swearing in of the jury. In *Ohio v. Roberts*, 448 U.S. 56 (1980), addressing the issue of reasonable diligence, the United States Supreme Court held:

Although it might be said that the Court's prior cases provide no further refinement of this statement of the rule, certain general propositions safely emerge. The law does not require the doing of a futile act. Thus, if no possibility of procuring the

20

> witness exists (as, for example, the witness'
> intervening death), "good faith" demands nothing of
> the prosecution. But if there is a possibility,
> albeit remote, that affirmative measures might
> produce the declarant, the obligation of good faith
> may demand their effectuation. "The lengths to which
> the prosecution must go to produce a witness
> . . . is a question of reasonableness." *California v.
> Green*, 399 U.S., at 189, n. 22 (concurring opinion,
> citing *Barber v. Page*, supra). The ultimate question
> is whether the witness is unavailable despite good-
> faith efforts undertaken prior to trial to locate and
> present that witness. As with other evidentiary
> proponents, the prosecution bears the burden of
> establishing this predicate. *Ohio v. Roberts*, 448
> U.S. at 74-75.

The facts before this Court suggest that Santana went to

Puerto Rico for the Christmas holidays. The recently

delivered mail (utility bill) further reflects an intention

to return on his part. Nowhere does the Commonwealth

establish that this witness is delinquent in paying any

bills. Nor is there any suggestion that he left a

forwarding address. Contrary to the facts in *Childs*, there

is no innuendo that Mr. Santana is hiding out as a result

of pending criminal process or warrants. Most likely, the

Commonwealth was lax in serving its summonses and simply

missed Mr. Santana as a result of the holidays.

### Given the inadequacy of cross-examination at the first trial, the prior testimony should never have been admitted

Arguing against the admission of such testimony,

defense counsel stated that this witness made two

contradictory statements on the day of the shooting, one at

3:25 a.m. and the next at 2:05 p.m. [Tr. III:16-17].  In
the both statements, Santana admits to never having
witnessed the shooting [App. 88-91].  He stated that he
"saw Marcos wave to Javier to come to the door, Javier went
to the door and opened the door and went outside.  I walked
from the kitchen to the front door to see why Marcos called
Jabier to the front door.  When I got to the front door I
heard a loud snap sound.  I pushed the door open and I saw
Marcos backing up..." [App. 88-89].  In his second
statement, Santana added "I want to add to the statement
that when I first heard the snap sound when Javier got shot
I was in the kitchen of the house.  I looked to the front
door when Marcos knocked on it I then saw Max Maldonado
standing at the front door..." [App.  91].[3]  The defense
correctly contended that prior counsel never brought out
this inconsistency [Tr. III:19, Tr. VI:73-110][4].  The trial
judge suggested that the defendant call and question the
officer who prepared the statement [Tr. III:20].  The
defense argued that this would only expose the

---

[3]    Similar to the second statement, Santana testified at
trial that Max Maldonado was standing in the doorway at the
time of the shooting [Tr. VI:81, App.  132].
[4]    The cross-examination of Santana at the first trial
ignores the fact that Max Maldonado was added at the time
this witness gave his second statement.

inconsistencies, not disclose the witnesses motive for the change of story [Tr. III:21].

This case was defended on the theory that the Marcos Sena struck the victim with the gun and that the weapon accidentally discharged [Tr. VII:16-19]. This theory was supported by Maureen Otero's testimony that Sena told her immediately after the shooting that this was an accident [Tr. V:64-80] Sergeant John Busa's concession of the gun discharging during "shock testing" further supports this defense contention [Tr. V:45-47].

This places tremendous importance on the testimony of the only two people (Max Maldonado and Tito) who witnessed the shooting. The credibility of each is suspect.

On the night of the shooting, Max Maldonado ingested a bag of heroin and between six and ten beers [Tr. V:89-90]. He has several criminal convictions [Tr. V:86-87]. He denied meeting with Attorney Max Beck and Gilberto Rivera and providing them with a statement [Tr. V:120]. Rivera testified otherwise. Maldonado admitted that he did not see the shooting [Tr. VI:133] and that he gave the police information that they had given him during the interview process [Tr. VI:134, App. 97-98].

Tito observed the defendant pull out a handgun and shoot Cruz [Tr. V:132-133]. Tito testified that he and Max

Maldonado were the only people in the doorway when the shooting occurred and that he tried to kick the gun away from the defendant [Tr. V:133-134]. He did not come forward with his story until January 5th of 1999 [Tr. II:7, V:154] and not until after a police officer told him that if he did not come forward that the defendant would walk [Tr. V:146]. Tito told private investigator David Tetrault that the defendant struck the victim in the head with the weapon at which time it discharged [Tr. VI:145]. He signed a statement acknowledging the same [App. 92-95].

"Once the hearsay declarant is shown to be unavailable, the party seeking to introduce the prior reported testimony must then show that the evidence is reliable." *Commonwealth v. Bohannon*, 385 Mass. 733, 746 (1982). "There are two aspects of reliability that might be considered. First, was the testimony shown to be reliable when given? Second, is the evidence of that testimony sufficiently accurate." *Id.* The answers to both question is no. Counsel at the first trial never questioned Santana as to why he added to his second statement Maldonado's presence at the scene of the shooting. Given the suspect nature of Maldonado's testimony this question is critical. One of only two eyewitnesses to the shooting, Maldonado is intoxicated with

24

alcohol and heroin. He accuses the police of coercing false testimony [App. 97-98]. He denies statements he purportedly made to the police [App. 97-98]. He denies witnessing the shooting App. 97-98]. Standing alone, one would logically question the integrity of Maldonado's trial testimony. However, adding Tito to the mix might well have given the jury the ingredient necessary to credit Maldonado as having been candid. In the context of Santana's testimony, this becomes critical. The defendant was unable to ask Santana whether Tito was in the doorway at the time of the shooting or somewhere else. Santana claimed that he told the victim that Sena wanted to see him [Tr. VI:80-81].

Question:    When you saw the defendant gesture with his finger, where was he pointing?

Answer:    He was pointing to Javier.

Question:    After you saw the defendant point in the direction of Carlos Cruz, what did you do or say?

Answer:    I told him that he wanted him.

Question:    What did you see Carlos Cruz then do after you told Carlos Cruz that?

Answer:    He got up from his chair.

Question:    Where did he go?

Answer:    He started walking toward the front door.

25

Question:      Did Carlos Cruz make it out that front
door?

Answer:      Yes.

Question:      Let me ask you, did you notice anybody
else standing by the front door?

Answser:      There was Max.  Max was standing by the
door between - - as you go in, there's like a little - -
there's like a little wall for the steps.  So Max was
standing like right there...[Tr. VI:80-81, App. 131-132].

Tito on the other hand testified that **he** got the
victim to go outside [Tr. V:147-148].

Q.   ...When was the first time that you say that you
saw Marcos Sena?  Where was he, sir?

A.   Standing in front of my doorway.

Q.   He was standing in front of your door?

A.   Yup.

Q.   All right.  And did you have to go somewhere to
get Mr. Cruz to go outside, sir?

A.   Yes.

Q.   Okay.  Now, how did you know that Marcos Sena
supposedly wanted to talk to Carlos Cruz, sir?

A.   He asked for him.

Q.   He asked for him?

A.   (Nodding head)

Q.   Did he open the door and talk to you, sir, or were you inside or outside at that point in time?

A.   I was inside.

Q.   You were inside?

A.   Yeah.

Q.   And so he said and you heard through the door that he wanted to see - -

A.   I opened the - -

Q.   - - Carlos Cruz?

A.   - - door a little bit.

Q.   I'm sorry?

A.   I opened the door a little bit.

Q.   You opened the door a little bit?

A.   Yeah.

Q.   All right.  And he asked - -

A.   I - -

Q.   - - to see Carlos Cruz?

A.   - - I asked him, "Who you looking for?"  And he asked me, "Carlos Cruz," as Javier.

Q.   Okay.  Now, do you know a person by the name of Max Maldonado?

A.   Yes.

Q.   Where was he?

A.   Standing right beside me.

27

Q.   He was at the door?

A.   Beside me.

Q.   He was beside you?

A.   (Nodding head)

Q.   All right.  Did you go somewhere, sir, to get Mr. Cruz?

A.   Yes.

Q.   Where did you go, sir?

A.   Kitchen.  He was sitting down in the kitchen.

Q.   All right.  And when you got in the kitchen, did you have a conversation with Mr. Cruz?

A.   No.

Q.   How did he know that Marcos Sena was, in fact, looking for him, sir?

A.   I told him there was somebody in the door for him.

Q.   Okay.  And did he then go to the door?

A.   Yes.

Q.   Did you follow him?

A.   Yes.

Q.   Why did you follow him, sir?

A.   I don't know.

Q.   I couldn't hear your answer.

A.   I don't know; 'cause, I followed him.

Q.   You just followed him?

A.   Yeah.   [Tr. V:147-150].

Neither Santana nor Tito make reference to seeing the other
or the other being present in the kitchen when getting the
victim's attention.   Santana testified that within seconds
of Cruz leaving the house he heard the gunshot [Tr. VI:82,
App.  132].   Tito testified that he actually followed the
victim out of the house and witnessed the shooting [Tr.
V:149-152].   Many aspects of his testimony are implausible.
He was eleven years old at the time of the shooting yet he
never discussed this with his mother until a few days
before the second trial - - nearly eight years later [Tr.
II:9-13, V:134-135].   It is also difficult to believe that
he tried to kick the gun out of the defendant's hand.
Nothing in Max Maldonado's testimony corroborates Tito's
declaration of valor or even his mere presence at the
scene.   This is critical in that if, through Santana, the
defense established that Tito did not witness the shooting,
the Commonwealth's case rests on the questionable testimony
of Maldonado.   The Commonwealth's act of adding Tito as a
witness makes Santana's testimony all the more crucial to
the defense.   This is compounded by trial counsel's failure
to present expert testimony corroborating his theory that

the gun accidentally discharged when Sena struck the victim in the face with the weapon.

"The decisions of [the Supreme] Court make it clear that the mission of the Confrontation Clause is to advance a practical concern for the accuracy of the truth-determining process in criminal trials by assuring that 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.'" *Dutton v. Evans*, 400 U.S.74, 89 (1970), quoting from *California v. Green*, 399 U.S. 149, 161 (1970). Making this determination requires a case by case analysis. *Commonwealth v. Bohannon*, 385 Mass. at 746. See also *Chipman v. Mercer*, 628 F.2d 528, 530 (9th Cir. 1980); *United States v. Rogers*, 549 F.2d 490, 501-502 (8th Cir. 1976).

Adding Tito leaves Santana's testimony untested in the context of this defense. This is violative of the defendant's Sixth Amendment rights to confrontation and to due process. See *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973).

Most compelling on this issue is the United States Court's recent decision in *Crawford v. Washington*, ____ U.S. ____ (2004). *Crawford* counsels that the Confrontation Clause plainly meant to exclude "core testimonial statements" *Id*. at ___. However the Court cautioned that

30

"not all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted. On the other hand, *ex parte* examinations might sometimes be admissible under modern hearsay rules, but the Framers certainly would not have condoned them." *Id.* at ___ . The Court continued that:

The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused — in other words, those who "bear testimony." 1 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an especially acute concern with a specific type of out-of-court statement.

Various formulations of this core class of "testimonial" statements exist: "*ex parte* in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois,* 502 U.S. 346, 365 (1992) (**Thomas, J.,** joined by **Scalia, J.,** concurring in part and concurring in judgment); "statements that were made

31

under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* 3. These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it. Regardless of the precise articulation, some statements qualify under any definition — for example, *ex parte* testimony at a preliminary hearing.

No doubt Santana's prior testimony is "testimonial". In the context of this case it is also untested. The addition of Tito provided a distinct need for the defendant to cross-examine Santana on the substance of his prior testimony. Failing to produce Santana and admitting his testimony violate the Sixth Amendment right to confront witnesses. For these reasons, this petition should be allowed.

Marcos Pena,
By his attorney,

Stephen Neyman
160 State Street
8th Floor
Boston, MA 02109-2502
617-263-6800
B.B.O. # 551576