UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARCOS SENA,<br>    Petitioner,<br><br>v.<br><br>LUIS SPENCER,<br>    Respondent. | )<br>)<br>)  Civil Action No. 05-10381-DPW<br>)<br>)<br>)<br>)<br>) |

RESPONDENT'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The respondent, Luis Spencer, through his counsel, the Attorney General of the Commonwealth of Massachusetts, hereby opposes the Petition for a Writ of Habeas Corpus that is the subject of the captioned action. The petitioner, Marcos Sena, has not demonstrated that the claims in his petition warrant the extraordinary relief of a writ of habeas corpus.

## PRIOR PROCEEDINGS

On May 19, 1992, a Middlesex County grand jury indicted the petitioner for one count of first-degree murder (Mass. Gen. Laws. ch. 265, § 1) and one count of unlawful possession of a firearm (Mass. Gen. Laws. ch. 269, § 10) (No. MICR 1992-00813). *See* [Supplemental Answer ("S.A") 1, 4, 14]. A Middlesex Superior Court jury convicted the petitioner as charged on July 19, 1996 (McEvoy, J., presiding). [S.A. 7-8]. Pursuant to Massachusetts statute, Justice McEvoy sentenced the petitioner to a committed term of life in state prison without the possibility of parole for the murder conviction. *See* Mass. Gen. Laws ch. 265, § 2; [S.A. 8].[1]

All first-degree murder convictions in Massachusetts are reviewed directly by the

---

[1] The docket sheets do not reflect the petitioner's sentence for unlawful possession of a firearm.

2

Supreme Judicial Court ("SJC"). *See* Mass. Gen. Laws ch. 278, § 33E. After reviewing the petitioner's case, the SJC awarded him a new trial on grounds of ineffective assistance of counsel; specifically, the Court found that the sanction resulting from his counsel's failure to comply with a discovery order deprived the petitioner of a substantial ground of defense. *See Commonwealth v. Sena*, 429 Mass. 590, 594-596, 709 N.E.2d 1111, 1113-1115 (1999).

The petitioner's second jury trial commenced before Justice Grasso and a jury in January, 2000. [S.A. 11]. That jury also convicted the petitioner of both charges, who was again sentenced to life imprisonment without the possibility of parole for the first-degree murder conviction, and a concurrent, committed state prison term of four-to-five years on the firearms charge. [S.A. 12].

While his second appeal was pending before the SJC, the petitioner moved for a new trial. The SJC remanded the case to the Superior Court, which denied the motion in a fifteen-page memorandum and order (Hely, J., presiding). [S.A. 165-179].[2] The SJC subsequently consolidated the petitioner's denial of this motion with his direct appeal and affirmed the convictions and judgment on May 28, 2004. *See Commonwealth v. Sena*, 441 Mass. 822, 809 N.E.2d 505 (2004). The petitioner filed his habeas corpus petition in this Court on February 28, 2005.

## STATEMENT OF FACTS

The state court's findings of fact are entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *See Gunter v. Maloney*, 291 F.3d 74, 76 (1st Cir. 2002); *Coombs v.*

---

[2] Justice Hely was assigned to hear the motion because Justice Grasso has been elevated to the Massachusetts Appeals Court. [S.A. 165-166].

3

*Maine*, 202 F.3d 14, 18 (1st Cir. 2000).  This presumption of correctness extends to factual determinations made by both state trial and appellate courts, *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002), *cert. denied*, 537 U.S. 1236 (2003), as well as to any factual findings implicit in the state courts' rulings.  *See, e.g., Parke v. Raley*, 506 U.S. 20, 35 (1992); *Flores v. Marshall*, 53 F. Supp. 2d 509, 514 (D. Mass. 1999).

The Supreme Judicial Court found the following facts with respect to the petitioner's murder of seventeen year old Carlos Cruz:[3]

> In the fall of 1991, the defendant was dating Maria Diaz, the mother of the seventeen year old victim, Carlos Cruz.  Diaz terminated the relationship in January, 1992, when her son informed her that the defendant was seeing other women.  At that time, the defendant threatened to kill Cruz.
>
> On the night of March 21, 1992, Diaz, her new boy friend, Angel Baretto, and her son Cruz were attending a friend's baby shower at 94 Lewis Street in Lowell.  Diaz and Baretto left the party briefly and then returned.  As they approached the house, they observed the defendant and Maureen Otero driving down Lewis Street.  Diaz flagged down the defendant and began to argue with him.  Baretto joined in, and a fistfight ensued, with Baretto the apparent victor.  The fight was observed by various persons attending the baby shower.  When the fight ended, the defendant and Otero drove to the defendant's apartment on nearby Middlesex Street.  The defendant was "mad" and told Otero that "he was gonna get them back."  The defendant went into his apartment briefly, leaving Otero in the car.  When he returned, they drove back toward Lewis Street and parked on another street nearby.  Otero described the defendant as still "mad."  The defendant left Otero behind in the parked car, and proceeded to 94 Lewis Street.
>
> Max Maldonado, the father of the baby for whom the party was being held, observed the defendant looking into the front window of the house at 94

---

[3] The SJC made findings of fact that are consistent with the following recitation in its earlier opinion, *see Sena*, 429 Mass. at 590-592, 709 N.E.2d at 1112-1113.  The respondent relies upon the findings of facts from the Court's more recent opinion because they are more complete, and this is the opinion the petitioner challenges.  In any event, the petitioner does not appear to contest any of the Court's factual findings.

4

Lewis Street. Maldonado saw the defendant motion for Cruz to come outside.[4] According to Maldonado, Cruz came outside and stood on the front steps with the defendant. Maldonado then saw the defendant "raise[] his hand and the shot went off." The defendant's hand "was pointed at the kid's face." Cruz fell to the ground, and the defendant ran off.

Angel Luis Nieves, then eleven years old, was also in attendance at the baby shower. Nieves testified that it was he who summoned Cruz to go to the front door when the defendant signaled for Cruz. Nieves then followed Cruz to the font door and stood in the doorway with Maldonado. According to Nieves, the defendant "pulled out his hand and shot Carlos Cruz." Nieves then saw the defendant "scatter[]" toward the back alley near 94 Lewis Street.

Otero was waiting for the defendant where he had left her. The defendant got in the car and "took off." The defendant told Otero what he had "hit somebody and the gun went off." As the defendant made this statement to Otero, he gestured with his right arm, extending the arm in front of him and moving it across from right to left. The import of this statement and gesture, and the theory of defense, was that the gun had gone off by accident when the defendant had used the gun to strike Cruz. The defendant told Otero that he was leaving for New York (where he was later found).

*Sena*, 441 Mass. at 823-825, 809 N.E.2d at 508-509.

The Supreme Judicial Court found the following facts with respect to the autopsy performed on the victim, and the forensic testing of the gun:

Cruz died of a single gunshot wound to the head. Dr. John Krolikowski, the medical examiner who performed the autopsy on Cruz, testified concerning the wound, which was immediately to the left of the victim's nose. Based on his observations, Dr. Kolikowski opined that the "weapon [was] fired very close to that surface, the facial surface." Dr. Krolikowski did not observe any evidence of scratches, abrasions or contusions that would reflect the gun's striking Cruz on the side of the face. On cross examination, he testified that the wound was "consistent with a near contact wound," but not a "total contact wound." He also

---

[4] In footnote 1 of its opinion, the SJC commented: "Diaz and Baretto had, in the aftermath of the fight, gone elsewhere rather than proceeding with their intended return to the baby shower. The Commonwealth's theory was that, unable to see the immediate objects of his revenge (Baretto and Diaz) at the party, the defendant opted to retaliate against Cruz as the closest substitute, consistent with his earlier threat to kill Cruz for other reasons." *Sena*, 441 Mass. at 824 n.1, 809 N.E.2d at 508 n.1.

5

acknowledged that there was an abrasion on the victim's face, which he attributed to "blunt trauma."

State police Sergeant John Busa had retrieved a .38 caliber semiautomatic weapon from underneath a parked car in front of 94 Lewis Street. Testing confirmed that it was the gun used in the shooting of Cruz.[5] Sergeant Busa pointed out the sharp front edges on the barrel end of the gun's slide, opining that if the gun had been used to strike someone, the victim would have been cut by those sharp edges. Sergeant Busa also testified concerning his observations of the wound on Cruz's face.[6]. In his opinion, the stippling on one side of the wound indicated that the gun had been "almost pressed to the skin at the time of the discharge."

*Sena*, 441 Mass. at 825, 809 N.E.2d at 509.

## ARGUMENT

Since Sena's petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). "AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.' 28 U.S.C. § 2254(d)(1)." *Brown v. Payton*, 544 U.S. \_\_\_, 125 S. Ct. 1432, 1438 (2005).

"A state-court decision is contrary to [the Supreme Court's] clearly established

---

[5] In footnote 2 of its opinion, the SJC stated: "Witnesses at the party had seen the defendant, immediately after the shot was fired, fling his arm out as if throwing something away."

[6] In footnote 3 of its opinion, the SJC stated: "Sergeant Busa's field of expertise was ballistics, and he was regularly called to attend autopsies involving victims with gunshot wounds. He had attended some 400 to 500 such autopsies."

6

precedents if it applied a rule that contradicts the governing law set forth in [Supreme Court] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme Court] but reaches a different result. *Williams v. Taylor*, [529 U.S. 362 (2000)]; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). A state court decision involves an unreasonable application of [the Supreme] Court's precedents if the state court applies [the] Court's precedents to the facts in an objectively unreasonable manner. *Williams v. Taylor*, [529 U.S.] at 405; *Woodsford v. Visciotti*, 537 U.S. 19, 24-25 (2002) (per curiam)." *Brown*, 125 S. Ct. at 1438-1439.

There is no bright line rule as to what constitutes an "objectively unreasonable" application of established Supreme Court precedent. *Williams*, 529 U.S. at 410. As the *Williams* decision makes clear, however, an unreasonable state-court determination is not the equivalent of an incorrect one. *Id.*

> Indeed, because Congress used the word "unreasonable" . . . , and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 534 U.S. 925 (2001). *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied*, 535 U.S. 960 (2002) (under AEDPA's "broad objective standard, a federal court cannot grant habeas relief simply because it disagrees with or finds error in the state court's application of federal law").

In his habeas petition, and in his memorandum in support, the petitioner agues that his trial counsel rendered ineffective assistance by failing to hire an expert ballistician, and that his

7

right to confront witnesses was infringed when the Commonwealth was permitted to introduce the prior recorded testimony of an unavailable witness. *See* Habe. Pet. ¶ 12, cl.1-2; Pet. Mem. at 5-16, 16-32. Under the circumstances of this case, neither of these claims warrant habeas corpus relief.

I. THE SUPREME JUDICIAL COURT CORRECTLY RULED THAT THE PETITIONER'S TRIAL COUNSEL DID NOT RENDER INEFFECTIVE ASSISTANCE BY DECLINING TO CALL A BALLISTICS EXPERT WHERE ANY SUCH EVIDENCE WOULD HAVE BEEN CUMULATIVE OF EVIDENCE ALREADY INTRODUCED EITHER THROUGH THE COMMONWEALTH OR BY THE PETITIONER'S CROSS-EXAMINATION, AND WHERE THE PETITIONER PRESSED A CREDIBLE CASE OF ACCIDENT TO THE JURY.

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable." *United States v. McGill*, 11 F.3d 223, 227 (1st Cir. 1993) (citation omitted).

Here, the crux of the petitioner's ineffective assistance claim is that, having recognized and pressed an ineffective assistance of counsel claim based upon trial counsel's failure to retain a forensic expert to bolster his claim that the shooting was the result of an accidental discharge,

8

appellate counsel, who appeared for the petitioner at his second trial, "[i]nexplicably" failed to retrain a forensic expert as well. Habe. Pet. ¶ 12, cl.1; Pet. Mem. at 10.[7] Although the petitioner characterizes this as "inexcusable," pet. mem. at 10, the SJC analyzed the case this way:

> At the outset, we note an anomaly in the claim. On appeal following the first trial, the defendant's then appellate counsel made the same argument, i.e., that trial counsel at the first trial had been ineffective in that he had failed to consult any forensic expert who could help analyze this evidence to support the defendant's theory of an accidental firing.[8]. Having obtained a reversal and remand for a new trial, the attorney who represented the defendant on that successful appeal proceeded to represent him at the second trial. In other words, the same attorney who had contended that failure to present expert testimony, or "even consult a forensic pathologist" was ineffective assistance of counsel mandating a new trial, chose not to retain an expert or present testimony from a forensic expert at the second trial. Against this backdrop, it would be difficult to characterize counsel's decision with respect to the forensic evidence as anything other than deliberate and tactical.[9]

*Sena*, 441 Mass. at 828-829, 809 N.E.2d at 511-512. In an attempt to rebut these factual findings, as the pertinent habeas corpus statute requires him to do by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and in an attempt to satisfy the two prongs of *Strickland*, the

---

[7] Although the petitioner pressed this claim on his first appeal to the SJC, that Court declined to act upon it, having reversed on another ground. *See Sena*, 429 Mass. 594-596, 709 N.E.2d at 1113-1115.

[8] In footnote 7 of its opinion, the SJC commented: "Because the court concluded that counsel had been ineffective with respect to his repeated noncompliance with discovery orders, the court did not need to address this additional theory of ineffectiveness. *Commonwealth v. Sena*, 429 Mass. 590, 596, 709 N.E.2d 1111 (1999)." *Sena*, 441 Mass. at 828, 809 N.E.2d at 511.

[9] In footnote 8 of its opinion, the SJC commented: "In his affidavit, trial counsel claimed that he 'cannot explain why [he] never engaged the services of a forensic pathologist and/or firearms exert.' The affidavit thus sheds no light on why he did not do so, but it also does nothing to dispel his prior awareness of the ostensible need for expert advice on these subjects." *Sena*, 441 Mass. at 829, 809 N.E.2d at 512.

9

petitioner points to the affidavits of his former attorney, and of Dr. Carl Majesky.[10] Pet. Mem at 11-12, 12-14.  Neither of these affidavits rebut the SJC's factual findings.

>   A.  The Petitioner Cannot Show That His Trial Counsel Was Deficient By Failing To Call An Expert Witness.

As the SJC noted, the affidavit of the petitioner's counsel is singularly unhelpful.  *See Sena*, 441 Mass. at 829 n.8, 809 N.E.2d at 512, n.8.  Specifically, counsel states that he "cannot explain why [he] never engaged the services of a forensic pathologist and/or firearms expert to support [his] defense," Pet. Mem. at 12; [S.A. 148-149].  This conspicuous silence is most plausibly explained by the fact that, absent a waiver by the petitioner, counsel is ethically prohibited from disclosing his trial strategy pursuant to the attorney-client privilege.  *See* Mass. R. Prof. C. 1.6.[11]  Since counsel is ethically prohibited from revealing why he declined to retain a forensic expert, merely stating that he cannot do so, as he has done in his affidavit, *see* Pet. Mem. at 12, does nothing to advance the petitioner's ineffective assistance claim.

Moreover, the SJC's conclusion that the failure to retain an expert witness was a reasonable trial tactic, *Sena*, 441 Mass. at 829, 809 N.E.2d at 512, is well supported by the circumstances of this case.  To begin with, the Commonwealth called:

> several expert witnesses as to how close the gun was to the surface of the victim's face at the time it went off (the defense view being that actual contact at the time of firing would be consistent with the gun striking the victim's face and

---

[10] The state court assumed that Carl Majesky is "qualified as a firearms or wounds expert." [S.A. 79].  The state court made this assumption because Dr. Majesky's affidavit "refer[ed] to a curriculum vitae, but none was attached to the affidavit filed with the court." [*Id.*].

[11] Nothing in the record supports the notion that the petitioner has waived his privilege, and the petitioner makes no claim that he has in fact done so.

10

> discharging on the force of that blow).  Dr. Krolikowski[12] had testified on direct
> examination that the gun was "very close" at the time it discharged, characterizing
> the would as a "near contact wound" (meaning "near the surface" of the skin).  On
> cross-examination, defense counsel obtained clarification that by the term "near,"
> Dr. Krolikowski meant that the distance could be as little as one inch.  Then,
> Sergeant Busa's[13] opinion placed the gun even closer, testifying that the gun was
> "almost pressed to the skin at the time of the discharge, but . . . at an angle,"
> which he characterized as an "incomplete contact" wound.  Finally, the
> Commonwealth's forensic chemist testified that she found occult blood inside the
> barrel of the gun (but no evidence of blood on the outside surface), consistent with
> a "close contact shot."

*Sena*, 441 Mass. at 427-428, 809 N.E.2d at 511 (alteration in original).  Additionally, defense counsel "also elicited testimony concerning Sergeant Busa's 'shock testing' on the gun, with Sergeant Busa conceding that the gun had fired once after being struck from behind several times with a hammer (thereby illustrating that the gun could discharge accidentally under the force of a blow)."  *Id.* at 828, 809 N.E.2d at 511.

In light of this expert forensic evidence, calling an additional expert to testify about the potential for accidental discharge, or the proximity of the weapon to victim's face would have provided the defendant with, at best, evidence that was cumulative of testimony already elicited.[14]  Failure to introduce cumulative evidence cannot be parlayed into a credible claim of ineffective assistance of counsel.  *See United States v. Harris*, ___ F.3d ___, 2005 WL 958219

---

[12] Dr. Krolikowski was the medical examiner who performed the autopsy on the victim. *See Sena*, 441 Mass. at 825, 809 N.E.2d at 509.

[13] "Sergeant Busa's field of expertise was ballistics, and he was regularly called to attend autopsies involving victims with gunshot wounds."  *Sena*, 441 Mass. at 825, n.3, 809 N.E.2d at 509, n.3.

[14] It is reasonable to infer that the attorney who represented the petitioner at his second trial would be well-versed with the testimony of these experts because he had handled the direct appeal from the petitioner's first trial.

11

(5th Cir. 2005); *Hall v. Lubers*, 296 F.3d 685, 693 (8th Cir. 2002), *cert. denied sub nom, Hall v. Roper*, 538 U.S. 951 (2003) (failure to present cumulative evidence is neither contrary to nor an unreasonable application of the governing principles found in *Strickland*).

    B.    <u>The Petitioner Cannot Show That He Was Prejudiced By His Trial Counsel's Decision Not To Hire An Expert Witness</u>.

In an effort to demonstrate that he was prejudiced by his former counsel's failure to retain a forensic expert, the petitioner points to the affidavit of Dr. Cal Majeskey,[15] and claims that it "casts substantial doubt on [his] guilt." Pet. Mem. at 12. Yet the SJC arrived at the opposite conclusion:

> . . . to the extent that establishing the gun's proximity to or contact with the victim's face was helpful to the defense as at least being consistent with his accident theory, the expert affidavit now before us does not offer anything on that issue beyond what was already acknowledged by the Commonwealth's witnesses and conceded in the prosecutor's closing argument. Indeed, Carl Majeskey, the expert now proffered by the defendant expresses the opinion that Sergeant Busa "evaluate[d] this wound correctly."[16] Majeskey characterizes the wound as a "partial contact" wound, just as Sergeant Busa called it an "incomplete contact" wound. Based on Sergeant Busa's testimony, the prosecutor's closing argument made the very point that the defendant now seeks to make by way of Majeskey's affidavit: "[O]ne portion of that gun was touching one portion of [the victim's] nose." While Majeskey goes on to criticize certain details of Dr. Krolikowski's testimony, the criticism focuses on points that were never tied to the allegedly critical issue of the degree of contact between the end of the gun and the victim's skin surface (e.g., quibbling that Dr. Krolikowski described the wound as "round" at one time, while referred to it as "oval" or "ovoid" at other times).[17]

---

[15] *See supra*, note 10. Nowhere in his petition or accompanying memorandum of law does the petitioner identify the qualifications of Dr. Majeskey.

[16] *See* [S.A. 145].

[17] In footnote 9 of its opinion, the SJC stated: "Majeskey does criticize Dr. Krolikowski's opinion that there was no evidence to indicate that the weapon struck the victim's face, with Majeskey opining that the facial abrasion seen in the autopsy photograph would be consistent with such contact. However, on cross-examination, Dr. Krolikowski acknowledged the presence

12

> Majeskey's affidavit, with its stated concurrence in Sergeant Busa's analysis of the issue, does not suggest that additional expert testimony for the defense would have offered anything of substance beyond that in Sergeant Busa's testimony (as emphasized in the prosecutor's closing).

*Sena*, 441 Mass. at 829-830, 809 N.E.2d at 512.

Further, there is no reason to believe that a jury would have accepted the opinion of Dr. Majeskey over Dr. Krolikowski because Dr. Majeskey neither performed nor attended the autopsy, but rather, criticized his colleague's work based solely upon his review of the autopsy photographs, *see, e.g.*, Pet. Mem. at 13, [S.A. 145-146 ("My photo copy shows stippling along the periphery of the entrance wound..."); ("The photocopy is pretty much actual size...")]. Moreover, the petitioner does not -- and cannot -- dispute the SJC's factual findings, which are supported by the record. As such, he cannot rebut their presumptive correctness, and more to the point, he cannot demonstrate that the SJC's opinion is contrary to, or an unreasonable application of, *Strickland*.[18] Under these circumstances habeas corpus relief must be denied.

II.     THE SJC PROPERLY RULED THAT INTRODUCTION OF THE PRIOR RECORDED TESTIMONY OF AN UNAVAILABLE WITNESS, WHO TESTIFIED AND WAS CROSS-EXAMINED AT THE PETITIONER'S FIRST TRIAL, WAS CONSTITUTIONALLY PERMISSIBLE.

The petitioner next argues that his conviction resulted from the denial of his Sixth

---

of that abrasion and conceded that it was distinct from the wound and damage caused by the bullet itself." *Sena*, 441 Mass. at 830, n.9, 809 N.E.2d at 512.

[18] The petitioner also makes a veiled argument, as he did in the SJC, that his counsel was ineffective for failing to argue the accident defense to the jury during his closing argument. Pet. Mem. at 11. This argument is contradicted by the record, [Tr. 5: 10, 16, 19, 20, 21], and further, the SJC noted that defense counsel argued the point to the jury. *See Sena*, 441 Mass. at 828, 809 N.E.2d at 511.

Amendment right to confrontation.[19]  This claim stems from the state court's allowance of the prior recorded testimony of a witness at the first trial, Fernando Santana, to be introduced into evidence at the second trial.  *See* Pet. Mem. at 16.  Specifically, the petitioner argues that "[t]he witness should not have been declared 'unavailable' given the Commonwealth's failure to demonstrate a good faith effort to obtain [the witness's] presence for trial," and that the SJC's findings to the contrary reflect an unreasonable application of the Supreme Court's opinion in *Ohio v. Roberts*, 448 U.S. 56 (1980), *overruled in part by Crawford v. Washington*, 541 U.S. 36 (2004).[20]  Pet. Mem. at 18.  He also argues that even if the Commonwealth's efforts to locate the missing witness were sufficient to satisfy the *Roberts* good-faith standard, the testimony "should never have been admitted" due to his perceived "inadequacy of cross-examination at the first trial."  Pet. Mem. at 21.  This, he claims, violated the principles set forth in *Crawford v. Washington*.  Scrutiny of the petitioner's arguments reveals that they lack merit.

>   A.   <u>The SJC'S Findings, None Of Which The Petitioner Disputes, Easily Satisfy The "Good Faith" Standard Articulated In *Ohio v. Roberts* For Missing Witnesses.</u>

In its opinion, the SJC found that the Commonwealth made the following efforts to locate

---

[19] The Sixth Amendment applies to the states by virtue of the Fourteenth Amendment. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 523 (2004).

[20] Although there is no question that the petitioner claims that the state courts deprived him of his Sixth Amendment right to confront witnesses, his theory as to why habeas corpus relief is appropriate under the AEDPA is far from clear.  It appears that he argues that the state courts unreasonably applied both *Ohio v. Roberts*, 448 U.S. 56 (1980) and *Crawford v. Washington*, 541 U.S. 36 (2004).  In any event, he raises no claim that the SJC's opinion is "contrary to" Supreme Court precedent, *i.e.* that the SJC's decision "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  Nor does he claim that the SJC "confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a[n opposite] result."  *Id.*

14

Santana prior to the second trial:

> . . . approximately one week prior to the scheduled retrial, the Commonwealth attempted to contact Santana, who had been a cooperative witness at the first trial. [citation omitted]. Unable to find Santana at the expected address, the police pursued other avenues, ultimately learning, by way of information from Santana's roommate, that Santana was in Vega Alta, Puerto Rico. However, no one had an address of telephone number from him there. The Puerto Rican authorities were enlisted to help search for Santana, and they checked possible addresses under that name (which they described as a very common name in Puerto Rico). By the fourth day of trial (the day on which the Commonwealth rested its case), Santana had still not been found. The Commonwealth met its burden of demonstrating a good faith diligent effort to locate Santana.

*Sena*, 441 Mass. at 833, 809 N.E.2d at 514-515. Further, in his memorandum, the petitioner sheds additional light on the Commonwealth's efforts to locate Santana, and notes that a Lowell detective contacted Santana's employers, checked with the Massachusetts Registry of Motor Vehicles, and the United States Postal Service, and spoke with a former girlfriend who told him that Santana was in Puerto Rico. *See* Pet. Mem. at 16. The petitioner also acknowledges that the search for Santana took place during the course of several days. *See* Pet. Mem. at 17-18. Under these circumstances, the SJC's ruling that "[t]he Commonwealth met its burden of demonstrating a good faith diligent effort to locate Santana," *Sena*, 441 Mass. at 833, 809 N.E.2d at 515, is entirely consistent with *Roberts*.[21] *See id.* at 74-75 (inquiries with parents and siblings as to witness's whereabout in addition to issuance of five subpoenas at parents' home over the course

---

[21] In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court overruled, in part, its holding in *Roberts*. "*Roberts* condition[ed] the admissibility of all hearsay evidence on whether it falls under a 'firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Crawford*, 541 U.S. at 60 (citing *Roberts*, 448 U.S. at 66). *Crawford* restricted this ruling so that testimonial statements could be admitted only if they had been previously subjected to cross-examination. *Id.* at 68-69. The *Crawford* Court did not, however, alter the *Roberts* test for determining whether the government has engaged in a good faith effort to locate a witness.

15

of several months sufficient to demonstrate good faith effort). It is thus axiomatic that the decision cannot be characterized as an unreasonable application of *Roberts*, and that the petitioner is not entitled to habeas corpus relief.

      B.      <u>The Admission of Santana's Testimony Cannot Be Contrary To Or An Unreasonable Application Of *Crawford* Where The Petitioner Admits That He Cross-Examined Santana At His First Trial</u>.

The petitioner's final argument is that Santana's testimony should not have been admitted because his cross-examination of him at the first trial was inadequate. His theory is that he was unable to cross-examine Santana about whether another witness, "Tito,"[22] saw the shooting because Tito did not testify at the first trial. Pet. Mem. at 24; *Sena*, 441 Mass. at 833-834, 809 N.E.2d at 515. In support of his argument, the petitioner cites to the Supreme Court's recent opinion in *Crawford*.[23, 24]

In *Crawford*, the Supreme Court modified the rule it established in *Ohio v. Roberts*, and ruled that as a prerequisite to the admission of testimonial, hearsay evidence, the defendant must have had the opportunity to cross-examine the declarant. *Crawford*, 541 U.S. at 68-69. Here, there is no dispute that the petitioner cross-examined Santana at the first trial. *See Sena*, 441

---

[22] According to the petitioner, "Tito" is the nickname for Angel Luis Nieves. *See* [S.A. 26]. In its opinion, the SJC refers to this witness by his last name, *i.e.* "Nieves." *See Sena*, 441 Mass. at 933-834, 809 N.E.2d at 515.

[23] Once again, the petitioner's theory as to why habeas corpus relief is appropriate under the AEDPA is unclear, but it appears that he argues that the SJC unreasonably applied *Crawford*. Pet. Mem. at 30 ("Most compelling on this issue is the United States Court's recent decision in *Crawford v. Washington*").

[24] Although the petitioner also cites to *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), there is no dispute that "The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id.*

16

Mass. at 833, 809 N.E.2d at 515 ("It is undisputed that the defendant had an opportunity to cross-examine Santana at the first trial, and in fact cross-examined him extensively."). Because the SJC correctly applied *Crawford*, *see Sena*, at 441 Mass. 832-934, 809 N.E.2d at 514-516, the petitioner is left to speculate as to how the jurors might have reacted had Santana been available to testify. *See, e.g.*, Pet. Mem. at 29 ("Many aspects of his testimony are implausible"). But such speculation does not take away from the fact that the SJC's correct *Crawford* analysis provides the petitioner with no basis upon which to be awarded habeas relief. This Court should deny his petition on this ground as well.

## CONCLUSION

For the foregoing reasons, this Court should deny the petition for habeas corpus relief.

Respectfully submitted,

THOMAS F. REILLY
Attorney General

/s/ Daniel I. Smulow
Daniel I. Smulow, BBO # 641668
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts 02108
(617) 727-2200, ext. 2949

Date: June 14, 2005