UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
MARCOS SENA,                    )
        Plaintiff,              )
                                )        CIVIL ACTION NO.
            v.                  )        05-10381-DPW
                                )
LUIS SPENCER,                   )
        Defendant.              )
```

MEMORANDUM AND ORDER
March 8, 2006

In 1996, Marcos Sena, the petitioner in this habeas corpus proceeding, was convicted of first degree murder and unlawful possession of a firearm in connection with the shooting death of Carlos Cruz. Based on a showing of ineffective assistance of counsel in connection with his first trial, the Supreme Judicial Court ("SJC") reversed and remanded the case to Superior Court for a new trial. Commonwealth v. Sena, 429 Mass. 590 (1999).

The second trial also resulted in convictions on both indictments. The Petitioner again filed a motion for a new trial, which was denied. On appeal, the SJC affirmed the convictions and the order denying the Petitioner's motion for a new trial. Commonwealth v. Sena, 441 Mass. 822 (2004).

The Petitioner has filed this petition for a federal writ of habeas corpus, under 28 U.S.C. §2254, claiming that he received ineffective assistance of counsel and that he was denied his right to confrontation at his second trial.

**I. BACKGROUND**

-1-

**A. Facts**

When considering habeas corpus petitions made pursuant to 28
U.S.C. § 2254, findings of fact by the state court "shall be
presumed to be correct" and the applicant for habeas relief
"shall have the burden of rebutting the presumption of
correctness by clear and convincing evidence." 28 U.S.C. §
2254(e)(1); see Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir.
2002); Coombs v. Maine, 202 F.3d 14, 18 (1st Cir. 2000). The
parties do not appear to contest the SJC's factual findings
regarding the second trial. I summarize those findings here.

In the fall of 1991, the Petitioner was dating Maria Diaz,
the mother of the seventeen-year-old victim, Carlos Cruz.[1] Sena,
441 Mass. at 823. Diaz terminated the relationship in January,
1992, when her son informed her that the Petitioner was seeing
other women. Id. At that time, the Petitioner threatened to
kill Carlos. Id.

On the night of March 21, 1992, Diaz, her new boyfriend,
Angel Baretto, and her son, Carlos, were attending a friend's
baby shower at 94 Lewis Street in Lowell, Massachusetts. Id.
Diaz and Baretto left the party briefly and then returned. Id.
As they approached the house, they observed the Petitioner and
Maureen Otero driving down Lewis Street. Id. Diaz flagged down
the Petitioner and began to argue with him. Id. Baretto joined
in and a fistfight ensued, with Baretto the apparent victor. Id.

---

[1] Carlos Cruz was also known as Javier.

-2-

Various persons attending the baby shower observed the fight. Id. at 823-24.

When the fight ended, the Petitioner and Otero drove to the Petitioner's apartment on nearby Middlesex Street.  Id. at 824. The Petitioner was "mad," and told Otero that "he was gonna get them back."  Id.  The Petitioner went into his apartment briefly, leaving Otero in the car.  Id.  When he returned, they drove back towards Lewis Street, and parked on another street nearby.  Id. Otero described the Petitioner as still "mad."  Id.  The Petitioner left Otero in the parked car, and proceeded to 94 Lewis Street.[2]

Max Maldonado, the father of the baby for whom the party was being held, observed the Petitioner looking into the front window of the house at 94 Lewis Street.  Id.  Maldonado saw the Petitioner motion for Carlos to come outside.  Id.  According to Maldonado, Carlos came outside and stood on the front steps with the Petitioner.  Id.  Maldonado then saw the Petitioner "raise[ ] his hand and the shot went off."  Id.  The Petitioner's hand "was pointed at the kid's face."  Id.  Carlos fell to the ground, and the Petitioner ran off.  Id.  Immediately after the shot was fired, witnesses at the party saw the Petitioner fling his arm out as if throwing something away.  Id. at 825.

Angel Luis ("Tito") Nieves, then eleven years old, was also

---

[2] In the aftermath of the fight, Diaz and Baretto had gone elsewhere, instead of returning to the baby shower as they had originally intended.  Commonwealth v. Sena, 441 Mass. 822, 824 n.1 (2004).

in attendance at the baby shower.  Id. at 824.  Tito testified
that he was the one who summoned Carlos to go to the front door
when the Petitioner signaled for Carlos.  Id.  Tito followed
Carlos to the front door and stood in the doorway with Maldonado.
Id.  According to Tito, the Petitioner "pulled out his hand and
shot Carlos Cruz."  Id.  Tito then saw the Petitioner "scatter[]"
toward the back alley near 94 Lewis Street.  Id.

Otero was waiting for the Petitioner in the car where he had
left her.  Id.  The Petitioner got into the car and "took off."
Id.  The Petitioner told Otero that he had "hit somebody and the
gun went off."  As the Petitioner said this to Otero, he gestured
with his right arm, extending the arm in front of him and moving
it across from right to left.[3]  Id.  Petitioner told Otero that
he was leaving for New York, where he was later found.  Id. at
825.

Carlos died of a single gunshot wound to the head.  Id.  Dr.
John Krolikowski, the medical examiner who performed the autopsy,
opined that the "weapon [was] fired very close to that surface,
the facial surface."  Id.  On direct examination, Dr. Krolikowski
said that he did not observe any evidence of scratches, abrasions
or contusions that would indicate the gun had struck Carlos on
the side of the face.  Id.  On cross-examination, he testified
that the wound was "consistent with a near contact wound," but

---

[3] The Petitioner bases his theory of defense on this
statement and gesture, claiming that the gun had fired accidently
when the Petitioner used it to strike Carlos.  Commonwealth v.
Sena, 441 Mass. 822, 824-25 (2004).

-4-

not a "total contact wound." Id. He also stated that there was
an abrasion on the victim's face, which he attributed to "blunt
trauma." Id.

State Police Sergeant John Busa had retrieved a .38 caliber
semiautomatic weapon from underneath a parked car in front of 94
Lewis Street. Id. Testing confirmed that it was the gun used to
shoot Carlos. Id. Sergeant Busa, a ballistics specialist,
opined that if the gun had been used to strike someone, the
victim would have been cut by the sharp edges on the barrel end
of the gun's slide. Id. Sergeant Busa also testified that in
his opinion, the stippling on one side of the bullet wound on the
victim's face indicated that the gun had been "almost pressed to
the skin at the time of the discharge." Id.

**B. Procedural history**

Petitioner was indicted on May 19, 1992, for one count of
first-degree murder and one count of unlawful possession of a
firearm. He was convicted of those charges on July 19, 1996, and
sentenced to a committed term of life in state prison without the
possibility of parole. See Mass. Gen. Laws ch. 265, §2.

All first-degree murder convictions in Massachusetts are
reviewed directly by the SJC. See Mass. Gen. Laws ch. 278, §33E.
After reviewing the Petitioner's case, the SJC granted him a new
trial on grounds of ineffective assistance of counsel. Sena, 429
Mass. at 596. The Court found that the sanction resulting from
defense counsel's repeated non-compliance with discovery orders
deprived the petitioner of a substantial ground of defense. Id.

-5-

at 594-96.  Because the court found ineffective assistance on
those grounds, it did not consider the additional theories of
ineffectiveness argued by Petitioner's appellate counsel, Greg T.
Schubert, specifically including defense counsel's failure to
retain a forensic pathologist or firearms expert.

    After a second trial in January 2000, at which Schubert
represented the Petitioner, the Petitioner was again convicted of
both charges and sentenced to life in prison without the
possibility of parole and a concurrent, committed state prison
term of four-to-five years on the firearms charge.  At this
second trial, Schubert inexplicably failed to retain a forensic
pathologist or firearms expert.

    While his second appeal was pending before the SJC, the
Petitioner, represented by yet another attorney, moved for a new
trial on the grounds of (1) ineffective assistance of counsel and
(2) discovery of new evidence.  The Petitioner contended that his
counsel was ineffective for failing to call a firearms or wounds
expert.  In support, he offered the post-trial affidavit of Carl
Majeskey,[4] which he contends calls into question Dr.
Krolikowski's testimony.  The Petitioner also offered what he
styles as newly discovered evidence that Dr. Krolikowski had been

_____

    [4] Carl Majeskey's affidavit refers to a curriculum vitae,
but none was attached to the affidavit filed with this court nor
originally in the Superior Court.  I will assume, for purposes of
this Memorandum, that Mr. Majeskey was qualified to provide
expert testimony.  See Commonwealth v. Sena, No. 92-813 (Superior
Court) (January 10, 2003) (Hely, J.) (Supplemental Answer at
168).

disciplined by the Board of Registration of Medicine for misreading prostate biopsy slides and one transurethral resection slide.

Justice Hely denied the motion for a new trial in the Superior Court.  <u>Commonwealth v. Sena</u>, No. 92-813 (Superior Court) (January 10, 2003).  The SJC consolidated the denial of the Petitioner's new trial motion with his direct appeal and affirmed the convictions and judgment on May 24, 2004. <u>Commonwealth v. Sena</u>, 441 Mass. 822 (2004).  The Petitioner filed his petition for habeas corpus in this court on February 28, 2005.

## II. DISCUSSION

The Petitioner fully briefs two grounds for this habeas petition.  First, he claims that Schubert, as trial counsel at the second trial, rendered ineffective assistance by failing to engage a forensic pathologist or ballistics expert to support the theory that Carlos Cruz died when the gun the Petitioner used to strike him in the face accidently fired.  Second, he argues that he was denied his Sixth Amendment right to confrontation when, in the second trial, the court admitted the testimony of a witness from the first trial.  In this connection, he contends that the Commonwealth failed to make a good faith attempt to locate the witness and that the cross-examination of this witness at the first trial was inadequate.

## A. Standard of review

This petition for habeas corpus was filed after the

effective date of the Antiterrorism and Effective Death Penalty
Act of 1996 ("AEDPA" or the "Act"), and, therefore, review of the
petition is governed by the Act.  See Lindh v. Murphy, 521 U.S.
320, 336 (1997).  AEDPA mandates that a federal court shall not
grant a writ of habeas corpus based on a claim that was
"adjudicated on the merits" in a state court proceeding unless
that adjudication "resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States."  28 U.S.C. § 2254(d)(1).

A state court decision is contrary to the Supreme Court's
clearly established precedents if it applies a rule that
contradicts the governing law set forth in the Court's cases, or
if it decides a case differently from the Court on a set of
materially indistinguishable facts.  Brown v. Payton, 125 S. Ct.
1432, 1438 (2005).  A state court decision involves an
unreasonable application of the Court's clearly established
precedents if the state court identifies the correct governing
legal principle from the Court's decisions, but applies it in an
"objectively unreasonable manner."  Id. at 1439.

An objectively unreasonable application of federal law must
be distinguished from simply an incorrect application of federal
law.  Williams v. Taylor, 529 U.S. 362, 410 (2000).  As Justice
O'Connor explained in Williams, the federal courts have an
obligation to say what the law is, and therefore, a state court's
reasonable, but incorrect legal determination should not be

-8-

allowed to stand.  Id. at 411.  However,

> a federal habeas court may not issue the writ simply because
> that court concludes in its independent judgment that the
> relevant state-court decision applied clearly established
> federal law erroneously or incorrectly.  Rather, that
> application must also be unreasonable.

Id.

### B. Ineffective assistance of counsel

The state court concluded that Schubert's failure at the second trial to retain or to call a forensic pathologist or ballistics expert did not constitute ineffective assistance of counsel.  In arriving at this conclusion, the SJC applied the following test:

> we begin by determining whether there was a serious failure
> by trial counsel.  If so, then we determine whether the
> failure resulted in a substantial likelihood of a
> miscarriage of justice.

Sena, 441 Mass. at 825.  With its requirement of both deficiency of performance and prejudice, this standard mirrors that articulated by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 688 (1984).  See Ouber v. Guarino, 293 F.3d 19, 32 (1st Cir. 2002) (noting that the Massachusetts standard for ineffective assistance of counsel is the "functional equivalent of Strickland").  Because the state court identified the employed federal principles, the issue presented by this case is whether the state court applied those principles in an objectively unreasonable manner.

To prevail on a federal claim of ineffective assistance of counsel, the Petitioner must demonstrate (1) "that 'counsel's

representation fell below an objective standard of reasonableness,' and (2) there exists 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  Dugas v. Coplan, 428 F.3d 317, 327 (1st Cir. 2005) (quoting Strickland, 466 U.S. at 688 (1984)).  I find that the SJC's conclusion as to the first prong was objectively unreasonable, but its conclusion as to the second prong was not.

1. Performance

In evaluating an attorney's performance, the proper measure "remains simply reasonableness under prevailing professional norms," considering all the circumstances.  Strickland, 466 U.S. at 688.  Although defense counsel must perform certain basic duties, such as consulting with the defendant on important decisions and avoiding conflicts of interest, there is no checklist for judicial evaluation of attorney performance.  Id. With respect to an attorney's duty to investigate, the issue that Petitioner raises here, Strickland held that

> counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 691.

The last phrase of the above quotation requires judicial scrutiny of counsel's performance to be highly deferential.  See

id. at 689.  The Strickland court was quite concerned that the
"distorting effect" of hindsight would lead a court to conclude
improperly that a particular act of counsel was unreasonable.
Id.  Therefore, the appropriate method for evaluating counsel's
performance is to "reconstruct the circumstances of counsel's
challenged conduct" and evaluate it from counsel's perspective at
the time.  Id.  This requires a court to "indulge a strong
presumption that counsel's conduct falls within the wide range of
reasonable professional assistance."  Id.

In denying Petitioner's motion for a new trial, Justice Hely
of the Superior Court held that Schubert's failure to engage an
expert witness at Petitioner's second trial did not constitute
ineffective assistance.  Commonwealth v. Sena, No. 92-813
(Superior Court) (January 10, 2003) (Supplemental Answer at 177).
Justice Hely focused on Schubert's competence in handling the
government's wound and firearms experts.  Id.  He found that
Schubert effectively cross-examined the experts, marshaled the
evidence in support of the accidental discharge theory, and in
general, showed "skill and reasonable tactical judgments."  Id.

The SJC also concluded that Schubert's conduct did not
amount to ineffective assistance.  The state high court based its
determination on two factors: (1) the opinions of the three
expert witnesses who testified for the prosecution and (2)
counsel's failure to explain his decision.

The SJC considered Schubert's opportunity to cross-examine
the three expert witnesses on the question of whether the gun was

-11-

touching the victim's face.  Dr. Krolikowski testified on direct examination that the gun was "very close" when it discharged and that the wound was a "near contact wound".  <u>Sena</u>, 411 Mass. at 827.  On cross-examination, Dr. Krolikowski explained that the gun could have been as close as one inch from the victim's face. <u>Id.</u> at 828.  Sergeant Busa testified that the gun was "almost pressed to the skin at the time of the discharge, but... at an angle."  <u>Id.</u>  He also conducted a shock test in which the gun fired when he hit it from behind with a sharp blow.  Tr. 4: 47. The Commonwealth's forensic chemist, Mary Kate McGilvray, testified that she found occult blood inside the barrel of the gun, which was consistent with "a close contact shot."[5]  <u>Id.</u>; Tr. 4: 64.

The state court viewed this testimony as favorable to the defense.  This characterization is not unreasonable; indeed, in his closing argument, Schubert referred to this forensic evidence in support of the defense's theory.  Ordinarily, this might be enough for an appellate court reasonably to conclude that Schubert's decision not to call an expert was a sound strategic choice.  However, this case contains an "anomaly", as the SJC delicately described it, that calls into question the competence of Schubert's performance.

Schubert represented the Petitioner on his first, successful appeal to the SJC.  In that appeal, Schubert argued that the

---

[5] Schubert declined to cross-examine the Commonwealth's forensic chemist.

Petitioner had been deprived of effective assistance because
counsel in the first trial had failed to call a forensic
pathologist or ballistics expert.[6]  Representing the Petitioner
in the second trial, Schubert himself then failed to call an
expert witness.  In other words, Schubert, in the second trial,
engaged in the very conduct that he earlier argued was
constitutionally deficient in the first trial.

Schubert provided no explanation for his conduct in the
second trial.  In an affidavit, he simply stated, "I ... cannot
explain why I never engaged the services of a forensic
pathologist and/or a firearms expert to support my defense in
this case."  Exhibit 1 at 56.  The state court observed,
correctly, that Schubert's affidavit "sheds no light on why he
did not [call an expert witness], but it also does nothing to
dispel his prior awareness of the ostensible need for expert
advice on these subjects."  Sena, 441 Mass. at 829 n.8.  The SJC
then concluded, "[a]gainst this backdrop, it would be difficult
to characterize counsel's decision with respect to the forensic
evidence as anything other than deliberate and tactical."  Id.
No such conclusion can reasonably be drawn from Schubert's
evasive averments.[7]

_____

[6] Because it set aside the verdict in the first trial on
other grounds, the SJC did not reach the question of whether
failing to call an expert in this situation constituted
ineffective assistance of counsel.

[7] Citing Massachusetts Rule of Professional Conduct 1.6, the
Attorney General contends that the attorney-client privilege
prohibited Schubert from disclosing trial strategy, and

Schubert's failure to consult forensic experts cannot be
characterized as deliberate in the sense that it was "a
conscious, reasonably informed tactical decision." Dugas, 428
F.3d at 332. His refusal to explain his own neglect to undertake
what he had previously argued in the same case was activity
necessary to effective counsel is at best a perplexing
demonstration of memory loss. At worst, it is an unprofessional
effort to aid and abet his client in post hoc confection of a
meretricious claim for purposes of collateral attack. But there
is simply no basis to find some conscious choice (of which
Schubert now professes to be unconscious) in his performance
regarding forensic experts. The SJC's studied disregard of
Schubert's current sphinxlike inscrutability cannot mask the

---

consequently, it would be improper to infer ineffective
assistance from Schubert's silence. I disagree.
    Rule 1.6 specifically allows the disclosure of confidential
information relating to the representation of a client "to
respond to allegations in any proceeding concerning the lawyer's
representation of the client." Mass. R. Prof. C. 1.6(b)(2)
Clearly, an allegation of ineffective assistance of counsel in
the habeas context is such a proceeding. See In re Lott, 424
F.3d 446, 452-53 (6th Cir. 2005)("The [attorney-client] privilege
may be implicitly waived by claiming ineffective assistance of
counsel or by otherwise raising issues regarding counsel's
performance"); Bittaker v. Woodford, 331 F.3d 715, 718-19 (9th
Cir. 2003) ("The rule that a litigant waives the attorney-client
privilege by putting the lawyer's performance at issue... dates
back to at least Hunt v. Blackburn, 128 U.S. 464 (1888)");
Johnson v. Alabama, 256 F.3d 1156, 1178 (11th Cir. 2001) ("By
alleging that his attorneys provided ineffective assistance of
counsel in their choice of a defense strategy, [defendant] put at
issue -- and thereby waived -- any privilege that might apply to
the contents of his conversations with those attorneys").
Moreover, Schubert did not invoke the attorney-client privilege
or otherwise indicate that the privilege prevented him from
disclosing his reasons for failing to call an expert witness.

clear and convincing error in its suggestion that Schubert's decision must have been "deliberate and tactical." Sena, 441 Mass. at 512. Schubert's argument in the first appeal was correct. Unexplained failure to consult expert witnesses in this setting is inadequate performance and was objectively unreasonable under prevailing professional norms.[8] See generally, Dugas, 428 F.3d at 327-332. Consequently, the question of ineffectiveness must move on to the second stage of evaluating prejudice.

2. Prejudice

Although I find Schubert's error professionally unreasonable, I may not disturb the ultimate state court judgment unless the defendant shows that but for the error, there is a reasonable probability that the outcome would have been different. Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. Put another way, "counsel's errors must have been so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

The SJC held that the failure to engage an expert witness

---

[8]I emphasize the obvious by noting that this is an objective evaluation of professional performance. Schubert's own prior admission that such a conclusion is compelled only demonstrates that even he understood the legal proposition. But his prior subjective recognition of the relevant professional norm has not itself played any role in my independent determination that his subsequent failure to meet it was unreasonable. Cf. Dugas, 428 F.3d at 334 n.24.

did not meet this standard.  The Petitioner contended that his only available defense was the theory that the gun accidentally discharged when the Petitioner used it to strike the victim in the face.  The "critical issue" in establishing this defense, the Petitioner argued, "was whether or not the gun had made contact with the victim's face." Id. at 9.  He reasoned that if the gun contacted the victim's face, it must have fired accidentally; if not, "the Commonwealth's theory of an execution type of murder would prevail." Id.

Quoting Justice Hely's careful and comprehensive decision denying the motion for a new trial, the SJC pointed out the flaws in the Petitioner's reasoning:

> [c]ontact between the gun and the victim's face neither proves nor disproves an accident.  Shooting someone in the face could be a premeditated murder whether the gun barrel was touching the skin, pushed into the skin or a short distance from the skin at the time the gun was fired.

Sena, 441 Mass. at 828 (quoting Sena, No. 92-813 (Supplemental Answer at 169)).

The SJC then explained that even if the Petitioner had called an expert, it would not have strengthened his defense, let alone affected the outcome of the case.  The Petitioner submitted the affidavit of Carl Majeskey, presumably a forensic pathologist or ballistics expert,[9] in support of the theory that the victim

---

[9] Majeskey's affidavit does not describe his qualifications. Majeskey states that he has had "extensive experience with weapons and crime scenes" and has shot tests from various weapons, but he provides no further explanation.  Majeskey Affidavit at ¶ 10 (Exhibit 1 at 53).  However, as noted in Note 4, supra, I assume, as did the state courts in their decisions,

had abrasions on his face consistent with being struck with a
gun.  Majeskey apparently neither attended nor performed the
autopsy, but offered his opinions based upon review of the
autopsy photographs.  Majeskey agreed with Sergeant Busa's
testimony, but questioned Dr. Krolikowski's expertise with
respect to near-contact gunshot wounds.  Majeskey Affidavit
(Exhibit 1 at 52, ¶ 6).

The SJC found that much of Majeskey's affidavit attacks
points that have little connection to the "critical issue" of
whether the gun came into contact with the victim's face.
Majeskey's ultimate opinion is that the wound on the victim's
face was a "partial contact wound" and the linear abrasion to the
bottom left of the entry could have been made by the front of a
pistol.  Id. at ¶ 11.  This may support the theory of the
defense, but the SJC concluded that because it contradicts
neither Dr. Krolikowski's nor Sgt. Busa's testimony and does not
contribute meaningful additional evidence, the Petitioner was not
prejudiced by its omission.[10]

This conclusion is objectively reasonable.  The Petitioner
focuses his argument for prejudice on the importance of the
victim's wounds to his defense.  He claims that because the two

_____

that Majeskey is a qualified expert.

[10] Justice Hely reviewed Dr. Krolikowski's, Sgt. Busa's, and
Majeskey's testimony in detail and also arrived at the conclusion
that the Majeskey affidavit "does not cast real doubt on the
justice of the conviction."  Sena, No. 92-813 (Supplemental
Answer at 177).

-17-

individuals who witnessed the shooting were not credible [11], the
victim's wounds were the only direct evidence supporting the
defense's theory of accidental death.  This is a distortion of
the relevant evidence.  Three witnesses testified on the nature
of the victim's wounds, and Majeskey's affidavit neither
contradicts nor substantively adds to that testimony. [12]
Consequently, I find that the SJC reasonably determined that
Majeskey's testimony does not sufficiently undermine confidence
in the outcome and thus there was no cognizable prejudice to the
Petitioner. [13]

---

[11] Maldonado and Tito testified that they were standing in
the doorway of 94 Lewis Street at the time of the shooting.
Petitioner's Memo at 14.  Maldonado has a criminal history and
admitted to ingesting both heroin and alcohol that day, and Tito,
who was eleven years old at the time, came forward with a
statement eight years later that he tried to kick the gun out of
the Petitioner's hand.  Id. at 14, 23-24.

[12] Majeskey does suggest avenues for further investigation.
For example, he notes that powder patterns left on the wound
could show the angle of entry of the bullet and the existence of
a magazine safety could have prevented accidental discharge.
Majeskey Affidavit at ¶ 11.  However, Sgt. Busa mentioned these
issues in his testimony, so they are not new, and, even if such
evidence could be shown to contribute materially to the defense's
case, the Petitioner does not argue that his counsel was
ineffective for failing to produce it.

[13] In his briefs to this court and the SJC, by reference to
Schubert's affidavit, the Petitioner obliquely suggested that
Schubert was ineffective for failing to argue in his summation
the theory of accidental shooting.  In his affidavit, Schubert
stated that he "had absolutely no idea why" he never argued this
theory of defense to the jury.  Schubert Affidavit, Ex. 1 at 56.
     The SJC did not explicitly address this issue, but noted in
its factual recitation that Schubert did indeed argue this
defense to the jury.  Sena, 441 Mass. at 828.  The transcript
fully supports the SJC's findings, Tr. 5: 12, 17, 18, 20, and the
Petitioner has shown neither deficient performance nor prejudice
from the alleged omission.  Consequently, I do not find that

## C. Right to confrontation

In the Petitioner's second trial, the judge allowed the prosecution to admit the prior recorded testimony of Fernando Santana, a witness who testified at the first trial.  The Petitioner claimed that the admission of Santana's testimony violated the Confrontation Clause of the Sixth Amendment.  He based his argument on two grounds: (1) that the Commonwealth failed to establish that Santana was "unavailable" to testify at the second trial; and (2) that the cross-examination of Santana at the first trial was inadequate to address alleged new issues that emerged in the second trial.

The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, see, e.g., Tennessee v. Lane, 541 U.S. 509, 523 (2004), guarantees a criminal defendant the right "to be confronted with all witnesses against him."  U.S. Const. Amend VI.  The Supreme Court has held that the Confrontation Clause restricts the admissibility of "[t]estimonial statements of witnesses absent from trial"[14]  in two ways:  such statements may be "admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-

---

Schubert rendered ineffective assistance on these grounds, despite his remarkable failure to recall accurately what in fact he did.

[14] The parties agree that the statements by Santana at issue here are "testimonial."  See Crawford v. Washington, 541 U.S. 36, 51 (2004) (including "prior testimony that the defendant was unable to cross-examine" as part of the "core class" of testimonial statements for purposes of the Confrontation Clause).

examine."  <u>Crawford v. Washington</u>, 541 U.S. 36, 59 (2004).

<u>1. Unavailability</u>

In determining whether Santana was "unavailable" for purposes of the Confrontation Clause, the SJC asked whether the prosecution had made a "good faith" effort to locate Santana. <u>Sena</u>, 441 Mass. at 832.  Although the SJC cited to Massachusetts law as the source of the test that it applied, <u>see</u> <u>Commonwealth v. Roberio</u>, 440 Mass. 245, 248 (2003), the standard appears to be identical to that applicable under federal constitutional law.[15] Having identified, or at least applied the equivalent of, the proper federal standard, the question is whether the SJC's application of that standard was objectively unreasonable. <u>Brown</u>, 125 S. Ct. at 1439.  I find that it was not.

The basic test of Sixth Amendment unavailability is well-established: "[A] witness is not 'unavailable' for purposes of the... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith* effort to obtain his presence at trial." <u>Ohio v. Roberts</u>, 448 U.S. 56, 74 (1980), overruled on other grounds by <u>Crawford</u>, 541 U.S. at 60 (emphasis in original).  A good faith effort does not require the doing of a futile act.  <u>Id.</u>  However, if a possibility exists, albeit

_____

[15]  The SJC has held that in order to satisfy the Confrontation Clause, "[t]he Judge must be satisfied that the Commonwealth has made a good faith effort to produce the witness at trial."  <u>Commonwealth v. Roberio</u>, 440 Mass. 245, 247-48 (2003) (internal quotations and citation omitted).  This test, like the one articulated by the Supreme Court, turns on the reasonableness of the prosecution's efforts.  <u>See</u> <u>Commonwealth v. Lopera</u>, 42 Mass. App. Ct. 133, 136 (1997).

remote, that the defendant might be produced, the good faith obligation may demand its effectuation.  Id.  "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness."  Id.  Ultimately, the "question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness." Id.

In this case, the SJC found that the Commonwealth made the following efforts to locate and produce Santana:

> [A]pproximately one week prior to the scheduled retrial, the Commonwealth attempted to contact Santana, who had been a cooperative witness at the first trial. [citation omitted]. Unable to find Santana at the expected address, the police pursued other avenues, ultimately learning, by way of information from Santana's roommate, that Santana was in Vega Alta, Puerto Rico.  However, no one had an address or telephone number for him there.  The Puerto Rican authorities were enlisted to help search for Santana and they checked possible addresses under that name (which they described as a very common name in Puerto Rico).  By the fourth day of trial (the day on which the Commonwealth rested its case), Santana had still not been found.

Sena, 441 Mass. at 833.  Based on the facts in the above quoted passage, the SJC found that the prosecution made a "reasonable effort in light of the particular facts of the case."  Sena, 411 Mass. at 832.

The Petitioner argues that the Commonwealth's efforts were inadequate to meet the good faith test.  He claims that Santana went to Puerto Rico for the holidays and was planning on returning immediately afterward.  Petitioner bases this claim on the fact that a prosecutor and a detective found an undisturbed utility bill at Santana's last address and the prosecution's

statement at trial that Santana might be away only for the weekend.  The Petitioner suggests that the prosecution was close to locating Santana at the time the evidence was admitted, so Santana was not yet "unavailable" for purposes of the Confrontation Clause.

The Petitioner undermines his own argument by referring to the details of the prosecution's efforts to locate Santana.  He notes that a Lowell Police detective had contacted employers, registry of motor vehicles, car registration, phone checks, mail forwarding addresses, and people who knew Santana.  The prosecution followed up on the rumor that Santana was only away for the weekend, and they still could not find him.  They provided the Puerto Rican police with Santana's name, date of birth, and social security number and contacted the people who the Puerto Rican police identified as possible matches.  Id. These facts sufficiently support the SJC's conclusion that the prosecution met the good faith standard of Roberts.[16]

## 2. Adequacy of cross-examination

It is undisputed that the Petitioner had an opportunity to cross-examine Santana in the first trial.  The issue is whether that cross-examination was adequate for purposes of the

---

[16] The Petitioner describes the prosecution's efforts to find Santana as "lax" in part because the prosecution did not commence the search in Puerto Rico until after trial had begun. However, the Petitioner belies this characterization when he notes that the search for Santana was ongoing at least as early as mid-November 1999, approximately two months before the start of the trial.

Confrontation Clause.  Having properly identified Crawford, 541
U.S. at 60, as the governing federal precedent, the SJC held that
the Petitioner had an adequate opportunity to cross-examine
Santana at the first trial, and therefore, the admission of
Santana's testimony did not violate the Confrontation Clause.
Again, I find that this determination is not objectively
unreasonable.

     In Crawford, the Supreme Court modified the rule it had
established in Roberts, by ruling that as a prerequisite to the
admission of testimonial hearsay evidence, the defendant must
have had the opportunity to cross-examine the declarant.
Crawford, 541 U.S. at 68-69.  The Confrontation Clause requires
this opportunity to be "adequate" and "full."  Roberts, 448 U.S.
at 73 n.12.  The effectiveness of counsel's cross-examination is
not part of this inquiry except in extraordinary circumstances.[17]
Id.  "[T]he Confrontation Clause guarantees only an *opportunity*
for effective cross-examination, not cross-examination that is
effective in whatever way, and to whatever extent, the defense
might wish."  Kentucky v. Stincer, 482 U.S. 730, 739 (1987)
(internal citations and quotations omitted) (emphasis in
original).

---

     [17] For example, such an inquiry may be warranted when the
representation provided by defense counsel at the prior
proceeding already had been held to be ineffective.  See Ohio v.
Roberts, 448 U.S. 56, 73 n.12 (1980) (citing Mancusi v. Stubbs,
408 U.S. 204, 214-15 (1972)).  Although the Petitioner in this
case makes a claim of ineffective assistance of counsel, it is
not with respect to the cross-examination of Santana.

In arriving at its decision that no Sixth Amendment violation had occurred, the SJC noted that the Petitioner "had an opportunity to cross-examine Santana in the first trial, and in fact cross-examined him extensively." Sena, 441 Mass. at 833. It also found that Tito's testimony at the second trial introduced no new, substantive issues into the case. Id. Tito testified that he and Maldonado were in the doorway at the time of the shooting and that he saw the Petitioner raise his hand. Id. Santana had not witnessed the shooting, and thus, the SJC concluded that he could neither meaningfully add nor detract from Tito's testimony. Id. Finally, the SJC found that the Petitioner had the motive and opportunity to question Santana at the first trial about everything that he saw and that Tito's later testimony did not change the evidence sufficiently to undermine that motive and opportunity. These conclusions are fully supported by the record, and consequently, are not objectively unreasonable.

In the first trial, when asked who was standing in the doorway, Santana mentioned only Maldonado. The source of the claimed constitutional violation here was the Petitioner's alleged inability to question Santana at the second trial as to whether Tito was also standing in the doorway at the time of the shooting.[18] The Petitioner claims that the question of Tito's

---

[18] In his brief, the Petitioner appears to suggest that he also did not have the opportunity to question Santana as to possible inconsistencies in two statements that he made to the police. However, the Petitioner cannot sustain a Confrontation

location was "critical" because it would serve to impeach him as one of only two potential eye witnesses to the shooting. Tito testified that he and Maldonado were in the doorway at the time of the shooting. If Santana had testified at the second trial that Tito was not in the doorway, the Petitioner reasons, Tito's credibility would have been destroyed, leaving Maldonado as the only remaining eyewitness. Maldonado, with his significant criminal record and ingestion of heroin and alcohol immediately prior to the shooting, was vulnerable to extensive impeachment, and thus the Commonwealth's case would have been significantly weakened.

In addition to the highly speculative nature of this argument, it fails for two reasons. First, although Tito did not testify at the first trial, the Petitioner had the opportunity and the motive to ask Santana in the first trial if anyone else was present in the doorway or if he saw anyone else who was in a position to witness the shooting.[19] As the SJC pointed out, a jury could infer from Santana's failure to mention him, that Tito

---

Clause claim on this ground. In the first trial, defense counsel questioned Santana thoroughly as to why he submitted two statements to the police, and the prosecution also questioned him on that issue. Tr. 4: 86-88, 104-105, 102-104.

[19] On direct examination, the prosecution asked Santana, "did you notice anybody else standing by the front door?" Tr. 4:81, thus inviting defense counsel to pursue the issue during cross-examination. In response to that question, Santana said, "There was Max," and then went on to describe Maldonado's position in the doorway. Id. Santana's answer did not mention Tito, but it also left open the possibility that other individuals were also present in the doorway.

was not present.  <u>Sena</u>, 441 Mass. at 834.  Santana's testimony
was thus favorable to the defense.  Perhaps this explains why the
trial attorney did not question Santana about Tito at that time.
In any event, the effectiveness of cross-examination strategy is
not at issue here.  See <u>Roberts</u>, 448 U.S. at 73 n.12.  As the SJC
put it:

> That the earlier cross-examination did not cover every
> detail and every possible avenue of impeachment that counsel
> would now like to pursue does not change the fact that the
> defendant had the requisite opportunity for cross-
> examination.

<u>Sena</u>, 441 Mass. at 833.  The Petitioner's counsel clearly had the
opportunity to cross-examine Santana at the first trial, and he
availed himself of that opportunity.

Second, as alluded to above, the harm that Petitioner claims
here is that his counsel was ineffective.  Santana did not
witness the shooting and offered no direct evidence as to whether
the shooting was accidental or not.  Additional cross-examination
would serve only to impeach Tito, who as the Petitioner points
out, was already of questionable credibility.  The Petitioner
does not claim that he was denied the opportunity to cross-
examine Tito at the second trial.  Thus, the heart of the
Petitioner's claim is not that he was denied his right to
confront either Tito or Santana, but that his attorney was unable
to successfully impeach Tito at the second trial.  This is at
best an effectiveness claim, and as such, is outside the purview
of the Confrontation Clause.

In sum, the SJC reasonably concluded that the admission of

Santana's testimony did not violate the Confrontation Clause. The Petitioner had the opportunity to cross-examine Santana as to Tito's whereabouts during the first trial.  Because the first trial concerned the same incident and charges as the second trial and Tito's testimony neither added new, material evidence nor directly contradicted Santana's prior testimony, the Petitioner had the same motive to question Santana in each case.  That defense counsel failed to ask Santana about Tito in the first trial and may have been unsuccessful in impeaching Tito in the second trial does not provide grounds under the Confrontation Clause for exclusion of Santana's testimony.

### IV. CONCLUSION

For the reasons set forth more fully above, I deny the petition for a writ of habeas corpus.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE